1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
E-mail: swestcot@bursor.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANESSA KING, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br>      v.<br><br>FLIXBUS, INC.,<br><br>                    Defendant. | Case No.    5:24-cv-2108<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Vanessa King ("Plaintiff") brings this action individually and on behalf of all other persons similarly situated (the "Class Members"), against Defendant FlixBus, Inc. ("Defendant" or "FlixBus"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all persons in California who have a Facebook account and booked travel arrangements on www.flixbus.com (the "Website").

2.      Defendant Flixbus is a passenger bus transport company. Travelers can book bus tickets for trips throughout the United States using Defendant's online Website. *See* **Figure 1**.



**Figure 1**

3.      Privacy is a crucial consideration when booking travel online, as it safeguards personal information from unauthorized access and misuse. With the

increasing reliance on digital platforms for making travel arrangements, consumers often share sensitive data, including personal identifiable information and travel itineraries disclosing travelers' future plans and whereabouts. Maintaining privacy fosters trust between consumers and travel providers, and prevents the unauthorized disclosure of this personal and sensitive information.

4.    Unbeknownst to travelers, Defendant aids, employs, agrees with, and conspires with third parties, including, but not limited to Meta Platforms, Inc., ("Facebook"), to eavesdrop on private communications sent and received by Plaintiff and Class Members, including communications that contain their personally identifiable information and private travel information (i.e., a "passenger manifest record" as defined by Cal. Civil Code § 53.5(d)). Plaintiff brings this action for legal and equitable remedies resulting from FlixBus's unlawful conduct.

## PARTIES

5.    Plaintiff Vanessa King is an adult citizen domiciled in Victorville, California.

6.    Plaintiff has actively maintained a Facebook account with Meta at all relevant times prior to and after booking her ticket through the Website. Plaintiff routinely accesses her Facebook account.

7.    In or around October 2023, Plaintiff visited the Website to book a bus ticket from Los Angeles, California, to Las Vegas, Nevada. Unbeknownst to Plaintiff Defendant assisted Facebook with intercepting her communications, including communications that contained her personally identifiable information and details regarding her travel itinerary. Such details include the departure and return date, the origin and destination cities, and the number of travelers in her party. Defendant assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization.

8.    By failing to receive the requisite consent, Defendant breached its duty of confidentiality and unlawfully disclosed Plaintiff's personally identifiable

information and private travel details (i.e. "passenger manifest records" under Cal. Civil Code § 53.5).

9.     Defendant FlixBus is a Delaware Corporation with its corporate headquarters in Dallas, Texas.  Defendant does business throughout California and the United States.

### JURISDICTION AND VENUE

10.     The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of different states than Defendant.

11.     This Court has personal jurisdiction over Defendant pursuant to Ninth Circuit precedent because of its contacts with the forum state.  First, by integrating the code that allowed a third party to wiretap communications, Defendant acted intentionally.  Second, Defendant knew that the harm would be felt in California because Defendant allowed consumers to book travel within the state of California. Third, Defendant expressly aimed its conduct at California because Defendant, in the regular course of business, allows consumers to book trips and travel throughout the state of California.  Collectively, such factors are sufficient for the Court to exercise personal jurisdiction over Defendant. *See Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1094–95 (9th Cir. 2023), *cert. denied* 144 S. Ct. 693 (2024).

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

# FACTUAL ALLEGATIONS

**A.    California Information Privacy Act**

13.    The California Information Privacy Act ("CIPA"), California Penal Code section 630, et seq., prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

14.    In enacting CIPA, the California Legislature expressly recognized "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

15.    Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device. As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

16.    To establish liability under California Penal Code section 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any

telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

17.     Under California Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

**B.     California Civil Code § 53.5**

18.     In 2018, the California Legislature enacted § 53.5 of the California Civil Code, to bring California citizens greater protections regarding travel.  More specifically, the Legislature recognized the importance of protecting personal information and travel information:

> (h) Protecting the privacy of personal information promotes consumer confidence and encourages both residents and visitors to travel to and within California and to patronize California businesses.

> (i) Therefore*, it is the intent of the Legislature to further Californians' right to privacy by ensuring that the personal information disclosed by patrons of lodging establishments and*

---

*bus companies is used for the intended business purposes and not improperly disclosed*.

Privacy—Consumer Protection—Traveling, 2018 Cal. Legis. Serv. Ch. 853 (S.B. 1194) (WEST)(emphasis added).

19.    According to § 53.5, "an owner or operator of a private or charter bus transportation company, or any employee or agent thereof, shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a passenger manifest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order."  Cal. Civil Code § 53.5(b).

20.    Per Cal. Civil Code § 53.5(d):

"Passenger manifest record" for purposes of this section includes any record that identifies an individual guest, passenger, customer, or invitee, including, but not limited to, their name, social security number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number.

21.    Consequently, "passenger manifest records" identifying Website users as a passenger are confidential, under California law.

**C.    Facebook's Platform and its Business Tools**

22.    Facebook describes itself as a "real identity platform," [1] meaning users are allowed only one account and must share "the name they go by in everyday life." [2]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender. [3]

---

[1] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[2] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[3] FACEBOOK, SIGN UP, https://www.facebook.com/

---

23.    In 2021, Facebook generated $117 billion in revenue.[4]  Roughly 97% of that came from selling advertising space.[5]

24.    Facebook sells advertising space by highlighting its ability to target users.[6]  Facebook can target users so effectively because it surveils user activity both on and off its site.[7]  This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[8] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[9]

25.    Advertisers can also build "Custom Audiences."[10]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[11]  With Custom Audiences, advertisers can target existing customers directly, and they can also build a "Lookalike Audiences," which

---

[4] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[5] *Id.*

[6] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[7] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[8] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[9] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[10] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[11] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

"leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[12]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[13]

26.    As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[14]  Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

27.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[15]  Facebook's Business Tools can also track other events.  Facebook offers

---

[12] Facebook, About Lookalike Audiences, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[13] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook, Create a Website Custom Audience, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[14] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[15] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    8

a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[16]  Advertisers can even create their own tracking parameters by building a "custom event."[17]

28.    One such Business Tool is the Facebook Tracking Pixel.  Facebook offers this piece of code to advertisers, like Flixbus, to integrate into their website.  As the name implies, the Facebook Tracking Pixel "tracks the people and type of actions they take."[18]  When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software script surreptitiously directs the user's browser to send a separate message to Facebook's servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Pixel is configured to collect.  This transmission is initiated by Facebook code and concurrent with the communications with the host website.  Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's website—Defendant's own code, and Facebook's embedded code.

29.    An example illustrates the point.  Take an individual who navigates to Defendant's website and enters their trip information (e.g. travel dates, departure city, arrival city, and trip dates).  When that tab is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.  Because FlixBus utilizes the Facebook Tracking Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening.  Facebook causes the browser to secretly duplicate the communication with

---

[16] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[17] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[18] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

---

Defendant, transmitting it to Facebook's servers, alongside additional information that transcribes the communication's content and the individual's identity. *See* Figure 2.



**Figure 2**

30.     After collecting and intercepting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

**D.     FlixBus and the Facebook Tracking Pixel**

31.     Defendant owns and operates the Website www.flixbus.com.

32.     Defendant integrates the Facebook Tracking Pixel into its Website. Through this tracking pixel, Defendant assists Facebook in intercepting personally identifiable information, as well as several details about consumers' travel itineraries, including the date of travel and location of travel.

33.     For example, as consumers are searching for tickets through Defendant's Website, it is assisting Facebook in intercepting details about their travel plans, including their departure and return date, the origin and destination locations, and the number of travelers. *See supra* Figure 2

34.    Once consumers are finalizing their travel details, Defendant assists
Facebook in intercepting information through the "InitiateCheckout" event. *See*
Figure 3.



**Figure 3**

35.    InitiateCheckout discloses that a user has initiated the checkout process,
and it also discloses the parameters that the user has selected, like their travel date,
the end location, and the number of travelers.

36.    As the above figures show, when users access and navigate Defendant's
Website, the Facebook Tracking Pixel will capture event data revealing the content
of their communications.

37.    The Facebook Tracking Pixel is also capable of pairing this event data
with a user's personally identifiable information.

38.    For example, when a user accesses Defendant's Website while logged
into Facebook, the Facebook Tracking Pixel will compel that user's browser to
transmit the c_user cookie, which contains the user's unencrypted Facebook ID.

39.    At a minimum, Facebook receives at least one cookie from a visitor's
browser.

40.    The fr cookie contains, at least, an encrypted Facebook ID and browser identifier. [19]   The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser. [20]   The datr cookies also identifies a browser.    Facebook, at a minimum, uses the fr and _fbp cookies to identify users. [21]

41.    The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[22]  If that happens, the time resets, and another 90 days begins to accrue.[23]

42.    The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[24]  If that happens, the time resets, and another 90 days begins to accrue.[25]

43.    The Facebook Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, FlixBus.[26]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[27]  The _fbp cookie is always

---

[19] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.

[20] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[21] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[22] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[23] Confirmable through developer tools.

[24] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[25] Also confirmable through developer tools.

[26] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[27] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

---

transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

44.    Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

45.    Defendant uses these cookies to pair event data with personally identifiable information so it can later retarget consumers on Facebook.

46.    By integrating the Facebook Tracking Pixel, Defendant assists Facebook with pairing these identifiers with event data.

47.    Defendant uses other Business Tools, like Conversions API, to assist Facebook with intercepting its users' communications.

**E.    Consumers Do Not Assent To Defendant's Terms**

48.    Defendant also does not provide reasonably conspicuous notice to users of its Terms & Conditions.  *See* Figure 4 (showing the checkout with no terms and conditions as it appears when a purchaser begins the checkout process).



**Figure 4**

49.    When a purchaser first enters the checkout page, there is no mention of the terms and conditions.  There is, however, a ten-minute checkout timer that immediately begins counting down. *See supra* Figure 4 (red box in the upper right corner emphasizing the checkout timer).

50.     In order for a purchaser to notice the "Terms & Conditions" language, he or she would need to complete Sections 1 through 4 of the checkout form (i.e. name,, seat reservation, extras, and contact information), and select their payment method before the hyperlink for the Terms even appears.  All while the checkout timer continues to count down.  It is only once the purchaser clicks their payment method (which then requires the purchaser to enter their information), that the hyperlink for the Privacy Policy, T&C of Booking, and the T&C of Carriage appear.



**Figure 5**

*See* Figure 5.

51.     If a purchaser does not complete the checkout process by clicking the pay now button before the timer runs out, they must restart the ticket search process.



**Figure 6**

*See* Figure 6

52.     If a purchaser clicks any of the links, they are redirected to a new page to read the specific document; at no point does the checkout timer pause.

53.     The average adult reads approximately 238 words a minute.  The countdown timer, which begins to toll as soon as the user enters the checkout page, lasts only 10 minutes.

54.     The Privacy Policy is more than 13,000 words long, the T&C of Booking is more than 4,000 words long, and the terms and conditions of travel redirects purchasers to other hyperlinks to the travel terms of Greyhound[28] and other carriers.[29]

55.     Assuming the purchaser had the full ten minutes to read the respective contracts—which they do not, because they must fill out Parts 1 through 4 of the checkout page before the links even appear—the purchaser would need to have a reading speed well over that of the average adult reader.  The average adult is only

---

[28] The Greyhound Terms are more than 13,300 words long (https://www.greyhound.com/greyhound-terms-and-conditions-of-travel).

[29] The other operators hyperlink, directs users to another page where they must locate the transport company, and then navigate each respective site to locate and read the terms (https://www.flixbus.com/operators-terms-and-conditions-of-travel).

capable of reading at a rate of 238 words per minute.[30] To read the Privacy Policy, the purchaser would need to read the dense legalese at a rate of more than 1,300 words per minute; to read the T&C of Booking, the purchaser would need to read the dense legalese at a rate of more than 400 words per minute.

56.     Accordingly, consumers do not assent to Defendant's terms, as Defendant intentionally conceals and limits a consumer's opportunity to review them prior to booking travel accommodations on its Website.

## CLASS ALLEGATIONS

57.     **Class Definition:** Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23 on behalf of a class consisting of all persons in California who have a Facebook account and who booked travel arrangements from www.flixbus.com (the "Class").

58.     Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

59.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

60.     Excluded from the Class is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his/her spouse and immediate family members; and members of the judge's staff.

---

[30] SCHOLAR WITHIN, AVERAGE READING SPEED, https://scholarwithin.com/average-reading-speed#:~:text=read%2020%20pages.-,Adult%20Average%20Reading%20Speed,of%20300%20words%20per%20minute.

61.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):** Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are at least thousands of individuals in the Class.  The identity of such membership is readily ascertainable from Defendant's records and non-party Facebook's records.

62.     **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiff's claims are typical of the claims of the Class because Plaintiff used www.flixbus.com to book travel arrangements and had her sensitive travel information and passenger manifest record information disclosed to Facebook without her express written authorization or knowledge.  Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

63.     **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the Class Members.  Plaintiff is represented by attorneys with experience in the prosecution of class action litigation, generally, and in the emerging field of digital privacy litigation, specifically.  Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

64.     **Commonality and Predominance (Fed. R. Civ. 23(a)(2), 23(b)(3)):** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class.  Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Class include:

(a)     Whether Defendant intentionally assisted a third party with tapping the lines of internet communication between itself and customers;

(b)    Whether Defendant assisted a third party with surreptitiously recording personally identifiable information, sensitive personal information, passenger manifest records, and related communications;

(c)    Whether Facebook was a third-party eavesdropper;

(d)    Whether Defendant's disclosures of personally identifiable information, sensitive personal information, and related communications constituted an affirmative act of communication;

(e)    Whether Defendant's conduct, which allowed Facebook—an unauthorized person—to view Plaintiff's and Class Members' personally identifiable information and sensitive personal information, resulted in a breach of confidentiality;

(f)    Whether Defendant violated Plaintiff's and Class Members' privacy rights by using the Facebook Pixel to record and communicate their FIDs alongside their confidential communications;

(g)    Whether Plaintiff and Class Members are entitled to damages under CIPA or any other relevant statute; and

(h)    Whether Defendant's actions violated Plaintiff's and Class Members' privacy rights as provided by the California Constitution.

65.    **Superiority (Fed. R. Civ. P. 23(b)(3)):**  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  Plaintiff knows of no

special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## COUNT I
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 631

66.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

67.     The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. CIPA begins with its statement of purpose – namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

68.     A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

69.    Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

70.    To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

71.    At all relevant times, Defendant aided, agreed with, and conspired with Facebook and other third parties to track and intercept Plaintiff's and Class Members' internet communications while accessing www.flixbus.com. These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

72.    Defendant, when aiding and assisting Facebook's wiretapping and eavesdropping, intended to help Facebook learn some meaning of the content in the form fields entered by Plaintiff and Class Members.

73.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

74.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Facebook Tracking Pixel falls under the broad catch-all category of "any other manner":

(a)    The computer codes and programs Facebook used to track Plaintiff and Class Members' communications while they were navigating www.flixbus.com;

(b)    Plaintiff's and Class Members' browsers;

(c)    Plaintiff's and Class Members' computing and mobile devices;

(d)     The computer codes and programs used by Facebook to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.flixbus.com; and

(e)     The plan Facebook carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit www.flixbus.com.

75.     The information that Defendant transmitted using the Facebook Tracking Pixel constituted sensitive and confidential personally identifiable information (i.e., passenger manifest records under Cal. Civ. Code 53.5(d)).

76.     By enacting Section 53.5 of the California Civil Code, the Legislature acknowledged Californians'—including Plaintiff's and Class Members'—privacy interest in their sensitive trip and travel details not being improperly disclosed by businesses such as Defendant.

77.     As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties to receive its customers' sensitive and confidential online communications regarding their trip details through www.flixbus.com without their consent.

78.     As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages. Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

### COUNT II
**Invasion Privacy Under California's Constitution**

79.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

80.     Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential online communications; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class members' knowledge or consent.

81.     At all relevant times, by using the Facebook Tracking Pixel to record and communicate consumers' sensitive and confidential online communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

82.     Plaintiff and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, and travel itineraries would remain confidential and that Defendant would not install wiretaps on www.flixbus.com.

83.     Indeed, by enacting Section 53.5 of the California Civil Code, which prohibits the disclosure of passenger manifest records, the Legislature intended to expand the privacy rights of Californians' to protect trip details and travel information.

84.     Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' sensitive and confidential online communications.

85.     This invasion of privacy was serious in nature, scope, and impact because it related to their sensitive and confidential online communications.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                               22

Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

86.    Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant FlixBus, as follows:

(a) For an order certifying the putative Class and naming Plaintiff as the representative of the class, and Plaintiff's attorneys as Class Counsel to represent the putative Class;

(b) For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the putative Class on all counts asserted herein;

(d) For statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiff and the putative Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.


Dated:  October 2, 2024          **BURSOR & FISHER, P.A**.

By:   _/s/ *Sarah N. Westcot*_____
                                   Sarah N. Westcot

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
E-mail: swestcot@bursor.com

*Counsel for Plaintiff*